# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

BRYAN JAMES BROWN,

         Plaintiff,

vs.

COMMISSIONER OF SOCIAL
SECURITY,

         Defendant.

No.  18-CV-3071-LTS-KEM

**REPORT AND
RECOMMENDATION**

_____

Plaintiff Bryan James Brown seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his application for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434.  Brown argues that the administrative law judge (ALJ), Michael Lee Larner, erred by relying on the testimony of the vocational expert (VE) at the administrative hearing, by discounting his subjective complaints, and by failing to include certain limitations in his residual functional capacity (RFC).  I recommend **affirming** the Commissioner's decision.

## I.     BACKGROUND[1]

After graduating from high school in 2002, Brown worked steadily until June 23, 2014, when he suffered from a workplace accident.  AR 61-62, 209, 2537.[2]  A pressure cooker filled with boiling broth exploded on Brown, severely burning a third of his body, primarily his arms and legs.  AR 35, 62, 2537-40.  Brown, who lived in Fonda, Iowa,

---

[1] For a more thorough overview, see the Joint Statement of Facts (Doc. 23).

[2] "AR" refers to the administrative record, filed at Docs. 13-2 to 15-9.

at the time (a small town more than two hours away from Omaha, Nebraska), was hospitalized for twenty days in the burn unit at an Omaha hospital. AR 2032, 2537. Upon his discharge, he returned to the home he shared with his wife, teenage daughter, and disabled son (then four years old), with the assistance of home health nurses coming once a week to change his wound dressings. AR 64, 458-531, 2018. At the time, providers anticipated Brown would be able to return to work in a month's time. AR 2053.[3]

While in the hospital, Brown suffered depression and trouble sleeping, and he began taking medication for his mental health for the first time. *See* AR 2862-63. Upon his release, he continued to suffer low mood, a few panic attacks, and nightmares about the accident and his time in the burn unit, and he sought treatment from the Plains Area Mental Health Center in Storm Lake, Iowa, a thirty-minute drive from Fonda. AR 2863-65. Eventually, it became clear that Brown would not be able to return to his previous employment, as even driving by the town where the accident occurred caused him to panic and vomit. *See id.*; AR 2062-63, 2099. A burn unit provider recommended Brown undergo job retraining through the workers' compensation proceedings. AR 2099.

Since his accident, Brown does not drive (due to the side effects from his pain medications), and there were few job opportunities in the small town in which he lived. *See* AR 2540, 2545, 2885-2900. He received rides to appointments from either his wife or by taxi, paid for by workers' compensation. AR 61. Upon his discharge from the burn unit, he had several follow-up appointments in Omaha, the last of which occurred in June 2015 (after which he stopped being prescribed oxycodone for six months). AR 2021-63, 2099-2102, 2245. He also had appointments (for hypertension and other

---

[3] Although the administrative record is voluminous, the treatment records from AR 294-2020 mostly cover Brown's twenty-day hospitalization (in that subset, there are also some treatment records from prior to Brown's accident, as well as from some follow-up with the burn unit within a few months of Brown's discharge).

ailments) with his primary care physician in Sac City, Iowa, about thirty minutes away from Fonda, and she prescribed Lyrica and Cymbalta for his pain in April 2015. AR 2665-67, 2687. In early December 2015, Brown had his first appointment at the Siouxland Pain Clinic in Sioux City, Iowa, about an hour and a half from Fonda. AR 2245-47. He complained of pain in his legs that worsened with standing as a result of his burns, and pain clinic providers prescribed slow-release oxycodone and tramadol for breakthrough pain. *Id.* He continued to receive these medications through 2017, visiting the pain clinic once every month or two (with longer gaps between visits when his son was in the hospital). AR 78-79, 2528-33, 2252-53, 2565-81, 2627-40. In May 2017 (once approved by workers' compensation), he began receiving testosterone injections from his primary care provider on a regular basis (the injections were originally prescribed by providers at the pain clinic, but his primary care provider took over their management). *See* AR 2634, 2636, 2642, 2843. Treatment records from the pain clinic mention a plan to wean Brown off tramadol and then opioids once he began receiving testosterone. *See* AR 2629.

Brown has also regularly received mental-health treatment at the Plains Area Mental Health Center since his release from the hospital in July 2014. He initially saw therapist Amy Riseberg, LMSW, but was quickly transferred to Heidi Lohff, LISW, (Therapist Lohff) due to her specialization in post-traumatic stress disorder (PTSD) and ability to provide eye movement desensitization and reprocessing (EMDR) therapy. *See* AR 2864-70. He received treatment from Therapist Lohff roughly twice a month (except for times when his son was sick and during a three-month period in the fall of 2015 when he received therapy from a different provider—psychologist Michael Baker—at the request of workers' compensation). *See id.*; AR 2836-49, 2932-40. He also had medication management appointments with nurse practitioners at Plains Area Mental Health anywhere from once a month to once every three months. *See* AR 2555-60, 2850-59, 2864-70, 2941-43.

In addition, Brown received numerous consultative examinations in connection with his workers' compensation claim (which he settled in December 2017 for $125,000 and the continued payment of his medical and mental-health expenses incurred as a result of the accident). AR 2077-89, 2411-16, 2536-54, 2587-2625, 2643-57, 2934. Brown applied for DI benefits in December 2015, alleging disability since the accident, and he received a psychological consultative examination at the request of the Social Security Administration. AR 33, 2509-12.

Brown's DI application was denied on initial review in May 2016 and on reconsideration in August 2016. AR 94-124. Brown requested review before an ALJ, and the administrative hearing took place by video on February 28, 2018. AR 33, 54-55. Brown and vocational expert Vanessa May (VE May) testified at the hearing. AR 50.

On June 5, 2018, the ALJ issued a written decision following the familiar five-step process outlined in the regulations[4] to determine Brown was not disabled from June 2014 through the date of the decision. AR 33-47. The ALJ found that Brown suffered from several severe impairments, including "status-post multiple burns on his upper and lower extremities," depression, anxiety, and PTSD. AR 35. Despite these impairments, the ALJ determined Brown retained the following RFC[5]:

---

[4] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. § 404.1520(a)(4)**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

[5] RFC means "the most that a claimant can do despite her limitations." *Sloan v. Saul*, 933 F.3d 946, 949 (8th Cir. 2019) (citing **20 C.F.R. § 416.945(a)(1)**).

4

[Brown] has the [RFC] to perform light work . . . with the ability to stand/walk for only 2/8 hours; should avoid pushing/pulling with the bilateral lower extremities; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes or scaffolds; should avoid concentrated exposure to extreme cold and heat as well as wetness; should be allowed to alternate positions every 30 minutes but would not need to be off task during those position changes; should avoid exposure to workplace hazards; and is limited to simple, routine tasks[.]

AR 36. Based on his determination of Brown's RFC and the testimony of the VE, the ALJ found that Brown could not return to his past work, but that a significant number of other jobs existed in the national economy that Brown could perform, such as sorter, charge account clerk, or telephone quotation clerk. AR 46-47.

Brown appealed. The Appeals Council denied Brown's request for review on November 14, 2018 (AR 1-4), making the ALJ's decision the final decision of the Commissioner. *See* **20 C.F.R. § 404.981**. Brown filed a timely complaint in this court seeking judicial review of the Commissioner's decision (Doc. 1). *See* **20 C.F.R. § 422.210(c)**. The parties briefed the issues (Docs. 25-27), and the Honorable Leonard T. Strand, Chief United States District Judge for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

## II.    DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Kirby*, 500 F.3d at 707. The court "do[es] not reweigh the evidence or review the factual record de novo." *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994). If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of

5

those positions represents the [ALJ's] findings, [the court] must affirm the decision." ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

Brown argues that the ALJ erred in relying on VE May's testimony rather than a VE who gave her opinion in connection with the workers' compensation proceedings. Brown also generally argues that the ALJ erred in discounting his subjective complaints based on his activities of daily living. Finally, Brown argues that the ALJ's RFC determination should have included the need for three absences a month, for extra breaks during the workday, and to be off task ten to fifteen percent of the work day.

### A. Significant Number of Jobs in the National Economy

Brown challenges the ALJ's reliance on VE May's testimony that a significant number of jobs exist in the national economy that someone with Brown's RFC could perform. Doc. 25 at 16-17. Once the ALJ determines that the claimant cannot perform his past work, the ALJ evaluates at step five whether the claimant can perform other work that "exist[s] in significant numbers in the national economy (either in the region where [the claimant] lives or in several regions in the country)." **20 C.F.R. § 404.1560(c)(1)**. The Commissioner bears the burden of proving that jobs exist in significant numbers that someone with the claimant's age, education, work experience, and RFC can perform. *See* ***Gieseke v. Colvin***, 770 F.3d. 1186, 1189 (8th Cir. 2014); **20 C.F.R. § 404.1560(c)(2)**. The Commissioner may meet this burden through testimony by a VE. *See* ***Moore v. Colvin***, 769 F.3d 987, 990 (8th Cir. 2014).

Here, VE May identified several jobs that Brown could perform based on the RFC determined by the ALJ. *See* AR 36-47, 87-89. Brown calls VE May's testimony into question, arguing that it conflicts with the opinion of Karen Stricklett, a VE who evaluated Brown's job prospects in connection with his workers' compensation claim. *See* AR 2885-2900. Brown's argument misses the mark for several reasons. First, VE Stricklett evaluated whether jobs existed for Brown "in the Northwest Iowa nonmetropolitan area"

6

or "the Fonda, IA area"—the local area where Brown lived at the time. AR 2896-97. But under the Social Security Administration regulations, the relevant inquiry is whether a significant number of jobs exist in the national economy, and the regulations specifically provide that when making this determination, "[i]t does not matter whether . . . [w]ork exists in the immediate area in which [the claimant] live[s]." **20 C.F.R. § 404.1566(a)(1)**. As VE Stricklett's opinion goes to the existence of jobs in the immediate area where Brown lived, the ALJ could appropriately assign it little weight after noting that the rules governing DI claims differ from those governing workers' compensation claims. *See* AR 43.

In addition, it is not clear whether VE Stricklett was evaluating the existence of jobs for a person with Brown's RFC as determined by the ALJ. VE Stricklett opined as to the existence of jobs in the "sedentary to light" category "that would not require standing/walking for greater than 30 minutes at a time and would not require prolonged exposure to sunlight or extreme temperature exposures," which is consistent with the ALJ's physical RFC determination. AR 36, 2897. But VE Stricklett also considered "the recommendations made by [psychiatrist] Dr. [Kunal] Patra with respect to Mr. Brown's memory issues and concentration difficulties." AR 2897. In summarizing Dr. Patra's recommendations, VE Stricklett quoted this portion of Dr. Patra's opinion:

> The important thing to pay attention to while looking at whether Mr. Brown can work in a competitive environment is that Mr. Brown has concentration difficulties coupled with memory issues. These combined with lack of energy and motivation, pervasive sense of fear/negativity, nightmares, sleep difficulties, increased irritability, low frustration tolerance, and panic attacks make it likely that Mr. Brown is functioning at a suboptimal level. The concern in such an individual is that with their emotional and physical reserves already being so low, they are apt to decompensate quickly when the work environment makes sudden demands on them.

AR 2892; *see also* AR 2622. It is unclear whether VE Stricklett analyzed jobs for a person limited to "simple, routine tasks," as found by the ALJ, or whether VE Stricklett

assumed Brown had additional memory and concentration issues based on Dr. Patra's opinion. AR 36.[6] The ALJ did not err in relying on VE May's testimony rather than VE Stricklett's opinion.

Brown also suggests in passing that the ALJ erred in relying on VE May's testimony because it conflicts with the O*NET, an online database of occupational information published by the Department of Labor. Doc. 25 at 17. Brown does not explain what limitations in the O*NET are incompatible with his RFC, instead generally saying that the O*NET "recognizes that these jobs [identified by the VE and ALJ] have greater skill and experience requirements than Mr. Brown has so . . . the jobs do not match Mr. Brown's capabilities." Doc. 25 at 17. In addition, Brown points to an Eighth Circuit case in which the Eighth Circuit held that an inconsistency between VE testimony and the Dictionary of Occupational Titles (DOT) (another Department of Labor publication containing occupational information), not an inconsistency with the O*NET, required remand. *See Montgomery v. Chater*, 69 F.3d 273, 276 (8th Cir. 1995). As other courts have noted, guidance from the Social Security Administration requires that ALJs resolve inconsistencies between VE testimony and the DOT but does not impose this same requirement on inconsistencies with the O*NET. *See Valentin v. Berryhill*, No. 3:17cv944(DFM), 2018 WL 4300119, at *10 (D. Conn. Sept. 9, 2018); *Cooley v. Colvin*, No. CIV. 13-5307, 2015 WL 1119973, at *5-6 (W.D. Ark. Mar. 12, 2015). To

---

[6] The ALJ assigned little weight to Dr. Patra's opinion, noting generally that it was issued in conjunction with Brown's workers' compensation claim and did not address issues relevant to the disability determination in the Social Security context. *See* AR 43. Brown argues in passing that the ALJ did not give sufficient weight to Dr. Patra's opinion. *See* Doc. 25 at 15-16. Brown cites a portion of Dr. Patra's opinion discussing Brown's diagnoses, as well as Dr. Patra's discussion of Brown's limitations, which was quoted by VE Stricklett. *Id.*; *see also* AR 2876-77, 2879-80. Brown does not identify specific limitations that the ALJ should have included in the RFC based on Dr. Patra's opinion, and as the ALJ suggested, it is unclear what additional limitations Dr. Patra's opinion supports (Dr. Patra's opinion that Brown should not work in an environment that would make "sudden demands" on him seems encompassed by the ALJ's limitation to simple, routine tasks).

the extent that Brown validly raised an argument based on the O*NET (which I doubt), I recommend that the district court reject a finding of error on this basis.

I recommend finding that VE May's testimony constitutes substantial evidence that a significant number of jobs existed in the national economy that Brown could perform.

### B. Subjective Complaints

Brown challenges the weight the ALJ assigned to his statements of his limitations. When evaluating the credibility of a claimant's subjective complaints—including pain or nervousness—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." ***Black v. Apfel***, 143 F.3d 383, 386 (8th Cir. 1998); *accord* ***Polaski***, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*,[7] 804 F.2d 456 (8th Cir. 1986). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." ***Black***, 143 F.3d at 386. The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may rest his credibility finding on "objective medical evidence to the contrary," ***Ramirez v. Barnhart***, 292 F.3d 576, 581 (8th Cir. 2002); or "inconsistencies in the record as a whole," ***Brockman v. Sullivan***, 987 F.2d 1344, 1346 (8th Cir. 1993). Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'" ***Schultz v. Astrue***, 479 F.3d 979, 983 (8th Cir. 2007) (quoting ***Hogan v. Apfel***, 239 F.3d 958, 962 (8th Cir. 2001)).

---

[7] The court did not explicitly say that it was reinstating the original *Polaski* opinion, but the Eighth Circuit has recognized that it "effectively reinstat[ed]" *Polaski*. ***Jones v. Callahan***, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997).

In failing to fully credit all of Brown's descriptions of his limitations, the ALJ relied on the treatment records and Brown's activities of daily living. *See* AR 45. Brown argues that the ALJ misconstrued the extent of Brown's activities of daily living. Doc. 25 at 19-20. The ALJ noted:

> [Brown] reported little to no problems with his personal care; he was able to do laundry every day; he cared for his disabled son to include changing his diaper and feeding him; he shopped in stores for food, clothing, and kids['] supplies; he reported no issues paying bills and handling funds; he enjoyed watching television on a daily basis; he reported no problems getting along with family, friends, neighbors, or others; he was able to follow spoken instructions "good" and written instructions okay; he had no problems getting along with authority figures; and he handled stress and changes in routine "good."

AR 45. The ALJ took these limitations from a function report Brown completed for the Social Security Administration in March 2016. AR 248-54. Brown points out that in that same function report, he noted some days his depression makes it hard for him to focus on television, so he lies down and listens to music instead. AR 252. Numerous treatment records reflect Brown reported being able to watch television (AR 2095, 2151, 2546, 2856), and substantial evidence supports the ALJ's determination that Brown was able to maintain the focus and concentration necessary to watch television on daily basis. Brown also notes that he testified his wife helps him with his socks and shoes (AR 68) and that in his function report, he noted it is hard for him to put socks on because his skin is sensitive (AR 250), but the ALJ took this into account by noting he reported "little to no" problems with personal care.

Brown also challenges the ALJ's finding that he helped care for his disabled son. Brown's son suffers from a condition causing his brain stem to deteriorate, and he is bedridden and unable to communicate or feed himself. AR 64-65, 2537. Brown argues that most of his son's care was provided for by his wife and by a home health nurse who has worked 8:00 a.m. to 4:00 p.m. Mondays through Fridays since his son was two years

10

old (AR 65). Substantial evidence supports the ALJ's determination that Brown provided care to his son, including by changing his diapers and feeding him. First, Brown reported these activities in his function report in March 2016, specifically noting that when the home health nurse left, "[he] or [his] wife take[s] care of him." AR 250. Second, substantial evidence supports the ALJ's determination that "throughout the entire record, it was noted how much the claimant cared for his ill wife in addition[] to his ill young child." AR 45; *see* AR 2164 (Brown reported in August 2014 that his "[w]ife has been in and out of hospitalization and [he] has had extra duties due to that" and noted he had been "[h]aving difficulty trying medication due to special needs son and" wife's illness); AR 2116 (Brown reported in March 2015 that he had not been able to nap during the day because his son and his wife had been sick and he needed to take care of his special-needs child); AR 2208-09 (Brown reported in October 2015 that he was less likely to suffer a panic attack during the day, when he was "busied by care for his wife" who had a broken foot, "his son, and even the step-dad"); AR 2211 (Brown reported in December 2015 that he was doing pretty well during the day "even with stressors such as his son's terminal illness and extreme care needed [and] his wife's healing broken foot"); AR 2510 (Brown reported in May 2016 participating in child care); AR 2546, 2553 (Brown reported in July 2016 that he and his wife could not leave the house, despite having a home health nurse to care for their son, because if their son choked, he was too heavy for the nurse to lift); AR 2568 (Brown reported in October 2016 that "[h]e has got an ill child at home that he is taking care of"); AR 2874 (when asked in April 2017 about his potential for returning to the workforce, Brown responded in part that it would be difficult because "his son's health issues require him to spend time at home and take care of his son"); *see also* AR 2297 (Brown reported shortly after his accident that he did not have many outside activities because he worked a lot and "has handicapped son at home that requires significant care and supervision"). The ALJ did not err in failing to credit

Brown's testimony that the home health nurse and Brown's wife (who is on disability) provide most of the care for Brown's son. AR 60, 75.

Brown also notes that the ALJ failed to acknowledge the limits in his activities of daily living. He no longer plays the guitar, a hobby he once enjoyed. AR 334, 1873, 2101. He no longer drives due to the drowsiness he feels as a side effect of his medications. AR 61, 248, 2095, 2510, 2545-46, 2548. He reported being unable to use the stove, oven, or grill since his accident, and being limited to making food in the microwave. AR 78, 249, 2510, 2891. He reported a lack of social activities (in part due to his inability to drive while living in a small town isolated from friends in other towns; I also note that he reported limited social activities prior to the accident due to his son's illness). AR 252, 355, 490, 2095, 2297, 2365, 2540, 2546, 2548, 2832, 2834, 2872, 2930. He testified that he does not do housework or yard work (AR 68), but he reported doing laundry in March and May 2016 (AR 249, 2510) and "participating in straightening up the home" in May 2016 (AR 2510). *See also* AR 2546 (reporting in July 2016 that his wife did most of the housework).

Although the ALJ failed to discuss the activities Brown is unable to do, this does not affect the ALJ's findings about the things Brown can do—unlike in *Tilley v. Astrue*, 580 F.3d 675 (8th Cir. 2009), the case relied upon by Brown. In *Tilley*, the ALJ discounted the treating-physician opinion based upon the claimant's ability to hang wallpaper, work at Walmart and as a census taker, and care for her sick husband, but failed to acknowledge that engaging in these activities caused fibromyalgia pain flares necessitating the claimant seek treatment from her doctor. *Id.* at 681. Here, the activities of daily living that Brown cannot do are reflected by the ALJ's limitations in his RFC— for example, housework involves a lot of walking or otherwise being on one's feet, and the ALJ limited Brown to work that mostly involves sitting. Conversely, the activities of daily living that Brown is able to do (in conjunction with the treatment records) support that he is only as limited as found by the ALJ in his RFC determination. Substantial

12

evidence supports the ALJ's reliance on Brown's activities of daily living (in addition to the treatment records) to discount Brown's subjective complaints.

### C. RFC's Failure to Include Limitations Related to Absences, Extra Breaks, and Being Off Task Fifteen Percent of the Day

Brown argues that substantial evidence does not support the ALJ's RFC determination. Brown argues that the record overwhelmingly supports a need for at least three unscheduled absences a month due to his medical appointments. The treatment records show that during the relevant time period, Brown attended therapy sessions lasting forty-five minutes to an hour about twice a month; short (fifteen- to thirty-minute) psychological medication-management appointments an average of once every two months; and medication management appointments at the pain clinic once every one to two months.[8] In addition, Brown began receiving testosterone shots (ordered by the pain clinic but managed by his primary care provider) in May 2017 (AR 2636, 2843, 2942), but it is unclear how frequently he needed these shots (Brown argues that he received the shots once every two months, but the pages he cites do not discuss appointments with his primary care provider or testosterone shots (AR 7, 68-69)). At the time of the hearing, Brown lived in Fonda, Iowa, and it took about thirty minutes to drive to Storm Lake

---

[8] Brown argues that he visits the pain clinic at least once a month. Although Brown has had pain clinic appointments twice in one month, his appointments have always been at the beginning and end of the month, and there has not been an appointment in either the previous or next month. In addition, his appointments at the pain clinic sometimes spanned two to three months. Thus, the record does not support that Brown attended pain clinic appointments at least once a month. *See* AR 2245-49, 2528-2534, 2565-81, 2627-42 (Brown attended pain clinic appointments on December 2, 2015; December 31, 2015; April 14, 2016; June 17, 2016; August 10, 2016; October 5, 2016; November 10, 2016; December 8, 2016; February 7, 2017, February 28, 2017; March 28, 2017; May 26, 2017; June 21, 2017; and September 11, 2017).

13

where he received mental-health treatment), an hour and a half to drive to the pain clinic in Sioux City, and thirty minutes to drive to his primary care provider in Sac City.

Brown argues that because he attends medical appointments two to four times a month at some distance from his residence,[9] he will miss work two to four times a month. Numerous district courts in the Eighth Circuit have rejected similar arguments. *See Timms v. Saul*, No. 4:18 CV 1653 DDN, 2020 WL 247970, at *3-5 (E.D. Mo. Jan. 16, 2020); *Lane v. Berryhill*, No. 4:17-CV-02393-ERW, 2019 WL 952069, at *5 (E.D. Mo. Feb. 27, 2019); *Lara v. Berryhill*, No. 4:16-CV-00564-PLC, 2018 WL 1744534, at *2-3 (E.D. Mo. Apr. 11, 2018); *Miller v. Berryhill*, No. 4:16-CV-01292 JAR, 2017 WL 3642035, at *7 (E.D. Mo. Aug. 24, 2017); *Penney v. Berryhill*, No. 16-CV-2097-LRR, 2017 WL 3301228, at *7-8 (N.D. Iowa July 11, 2017), *report and recommendation adopted,* 2017 WL 3299392 (Aug. 2, 2017) (clear-error review); *Jeffries v. Berryhill*, No. 4:16 CV 18 JMB, 2017 WL 365439, at *5-7 (E.D. Mo. Jan. 25, 2017); *Morin v. Colvin*, No. 4:14-CV-000769-NKL, 2015 WL 4928461, at *9-10 (W.D. Mo. Aug. 18, 2015); *Kittelson v. Colvin*, No. C12-0094, 2013 WL 2444030, at *11-12 (N.D. Iowa June 5, 2013); *Assel v. Astrue*, No. 4:09-CV-00941-NKL, 2010 WL 4628926, at *6 (W.D. Mo. Nov. 5, 2010); *Engel v. Astrue*, No. CIV. 08-5069-RHB, 2009 WL 2230921, at *3-4 (D.S.D. July 24, 2009); *see also Barnett v. Apfel*, 231 F.3d 687, 691 (10th Cir. 2000). Courts have reasoned that "simply because a claimant requires regular healthcare appointments does not necessarily mean he cannot work on the days he has appointments, such as by arranging appointments around the work schedule or during breaks, nor even that the claimant would need to miss an entire work day for an appointment." *Morin*, 2015 WL 4928461, at *9. Here, the record does not support that

---

[9] In his reply brief, Brown makes arguments based on the new city he lives in and his new pain-management provider, but nothing in the record establishes that Brown moved prior to the date of the ALJ's decision, which is the relevant time period (at the time of the hearing, Brown still lived in Fonda). *See* AR 25, 30, 59.

Brown would need to miss an entire day of work for his appointments—indeed, all of Brown's regular appointments last for less than an hour and could be accomplished during a lunch break or around a work schedule. Although Brown is unable to drive and lives in a small town such that it takes a significant amount of additional time to get to his appointments, as discussed in the section on the VE testimony, the relevant inquiry is the limitations caused by Brown's impairments and whether he can perform work in the national economy; limitations caused by the fact that he lives in a small town at some distance from all medical and psychological providers are not considered under the regulations.

Brown also argues that the ALJ should have included a limitation in his RFC reflecting the need for unscheduled breaks or consistently being off task more than 10% of the time. In support, Brown points to his poor sleep, spells of tearfulness, and panic attacks and flashbacks. Doc. 25 at 12-13. The treatment records support that Brown consistently reported suffering nightmares about the accident, leading to poor sleep (usually only four hours of sleep a night). AR 2209-11, 2245, 2397, 2542, 2547, 2652, 2836, 2838, 2840, 2842, 2844, 2851, 2856, 2863-71, 2929, 2933, 2936-37, 2939-40. Mental-health treatment records also reflect that Brown often endorsed symptoms of crying and became tearful during therapy sessions. *See* AR 2200 (July 2014: reported symptoms of crying at initial therapy session); AR 2157 (August 2014: Brown reported "crying for no reason" at first appointment with psychiatric nurse practitioner); AR 2189 (January 2015: Brown stopped an EMDR session because he was crying and felt "too frustrated" to continue); AR 2174 (February 2015: Brown reported that "starting about 2 weeks ago," he has been sad all the time and feels like crying constantly); AR 2099 (March 2015: burn clinic treatment note reflecting that Brown's wife called in hysterics with concerns that workers' compensation was pushing Brown beyond his limits and also

15

noted Brown is "frequently tearful at home[,] which saddens" her); AR 2542 (May 2015: Brown reported suffering crying spells once or twice a week during a workers' compensation consultative examination); AR 2124 (July 2015: Brown reported "frequent crying spells" during medication-management appointment); AR 2488 (April 2016: Brown reported that he was doing better prior to his son's hospitalization (around February 2016), but his son's health caused him to backslide and "he is very emotional now, the slightest thing will move him to tears"); AR 2511 (May 2016: Brown's depression screening in connection with a consultative examination ordered by the Social Security Administration was positive for tearfulness); AR 2551 (July 2016: Brown reported suffering crying spells two to three times a day during a workers' compensation consultative examination); AR 2616, 2620 (April 2017: Brown reported during workers' compensation consultative examination that he "continues to display easy tearfulness," that "he was miserable, tearful and numb before he got on his current combination of medications," and that "he felt that despite the slight improvement, he was still miserable, felt numb a lot, and still depressed"); AR 2942 (January 2018: after workers' compensation settlement, Brown reported that he was doing better, still suffering depression but not as severe, and still having crying spells but not as bad); AR 2143, 2148-52, 2254, 2296, 2840-41, 2933 (Therapist Lohff often noted Brown was tearful during therapy sessions). But with regard to flashbacks and panic attacks, the treatment records support that Brown primarily suffered these kinds of symptoms at night in the form of nightmares, not during the day (although he could be triggered during the day, such as when he drove by the town where the accident occurred). *See* AR 531, 2209, 2124, 2211, 2547, 2856, 2864-70, 2939.

Substantial evidence supports that Brown did not suffer panic attacks and flashbacks with such frequency that he would routinely be off task or need extra breaks. With regard to Brown's tearfulness, he often linked his depression to feeling unable to

16

work and contribute to his family, and multiple consultative examiners opined that Brown's mental health would improve if he returned to the workforce. AR 2871, 2878-80. In addition, in determining Brown's mental RFC, the ALJ relied on Brown's mental-status examinations, in which he was noted to be pleasant and cooperative and with little to no deficits in memory, attention, concentration, and thought processes. AR 45. Substantial evidence supports the ALJ's determination that despite suffering nightmares and other mental-health symptoms, Brown could focus and concentrate to the extent necessary to perform simple, routine tasks. The ALJ did not err by failing to include additional mental limitations in Brown's RFC.

## III. CONCLUSION

Realistically, given Brown's inability to drive, it does not appear that Brown will be able to work if he continues to live in a small town, at least thirty minutes away from all his medical providers, and without many job opportunities. But, the disability determination focuses on the existence of jobs in the national economy—and if Brown lived in a bigger city (such as Sioux City), it seems that he could perform work that involved mostly sitting and still receive the treatment he needs during lunch or other breaks. Therefore, although I feel for Brown and recognize he will never be the same after his workplace accident, I recommend that the district court **affirm** the Commissioner's decision and enter judgment in favor of the Commissioner.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. **Fed. R. Civ. P. 72**. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and

Recommendation, as well as the right to appeal from the findings of fact contained therein. *See **United States v. Wise***, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

      **ENTERED** this 25th day of February, 2020.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa